JOSEPH MONDELLI, *ET AL.*, PLAINTIFFS, v.
EDWARD A. PIZZI, *ET AL.*, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided September 15, 1967.

*Mr. Juan J. Ryan,* attorney for plaintiffs.

*Messrs. Gindin & Gindin,* attorneys for defendants Michael Mondelli and Marie Mondelli (*Mr. William H. Gindin* appearing).

*Messrs. Bourne, Schmid, Burke & Noll,* attorneys for defendants Vito and Anna Mondelli (*Mr. Robert Schaul* appearing).

*Mr. Donald I. Bierman,* attorney for defendant, Peter Imbimbo.

HERBERT, J. S. C. When Frank Mondelli died on November 26, 1959 he left a will which purported to dispose of four tracts of land. Three were held by the testator and his wife Francesca as tenants by the entirety, and since his wife survived him, he had no estate in them to devise. The tracts in which Mondelli had no devisable interest were the following:

A plot of vacant land on Springfield Avenue, Berkeley Heights, known as Block 116, Lot 39A on the tax assessment map. By the second clause of the will this was purportedly devised to testator's daughter Maria and his son Joseph, the share specified for Maria being 25% and that of Joseph 75%.

Four vacant lots on Plainfield Avenue, Berkeley Heights, purportedly devised to testator's son Michael.

Four other vacant lots on Plainfield Avenue, Berkeley Heights, purportedly devised to the widow.

A fourth parcel, located at the intersection of Springfield and Summit Avenues in Berkeley Heights, was owned by testator alone, subject only to his wife's dower. At the date of death this was the most valuable of all of the properties and was devised by the fifth clause of the will to the widow for life, with remainder to a son Vito and the daughter Maria.

I am satisfied that Mondelli thought all of the real estate was his to dispose of by will, and that his wife and all four of his children thought so too. After recovering, at least to some extent, from the severe illness which had inspired the making of the will on June 10, 1958, he conferred in the summer of 1959 with his attorney about possible testamentary changes. He had in mind a question about changing the second clause to leave what had been designated as Joseph's share to the son of Joseph. Francesca Mondelli participated actively in the discussion and was very insistent that Michael's designated share, which also had come up as the subject of a possible change, should remain just as it was. Both shares, of course, consisted of plots held by the entirety.

Promptly following Mondelli's death his will was probated and his son Joseph qualified as executor. An inheritance tax return was filed in February 1960. In it all the parcels of Mondelli real estate are listed as though owned solely by Mondelli at the time of his death; no tenancies by the entirety are noted.

The parcel specified in the will as Michael's was valued in the return at $300. A similar parcel of four vacant lots, purportedly devised to the widow, was valued at the same figure. The plot purportedly devised to Joseph and Maria was valued at $7,000, and the property at the intersection of Springfield and Summit Avenues, Berkeley Heights, owned in fee by the testator alone, was given a valuation of $19,750.

Mrs. Mondelli never did anything or said anything, either before or after her husband's death, to question the effectiveness of his will. She outlived her husband by two years and

four months, dying intestate in March 1962. While a widow she lived in the premises at the intersection of Springfield and Summit Avenues, thus enjoying the life estate given to her by her husband's will. In June 1961 she executed and delivered to her son Vito a deed describing the four lots purportedly devised to her by the fourth clause of Frank Mondelli's will. That deed recites:

"Being the same premises of which Frank Mondelli died seized and which he devised to his wife, the said Francesca Mondelli, by his Last Will and Testament, which was probated in the Surrogate's Office of Union County on January 5, 1960."

While Mrs. Mondelli was alive no other members of the family questioned the effectiveness of the will. On the other hand, some actions were taken by the children to indicate an acceptance of the will as written. Vito obtained from his mother the deed already mentioned. Joseph and his sister Maria (the named defendant Marie Santore), believing themselves to be the owners of the vacant land purportedly devised to them by the second clause of the will, leased that land for a term of 15 years to defendant Peter Imbimbo, who has spent $12,857.44 on a building and other improvements. Joseph, as already noted, acted as executor of the will and questioned none of its provisions.

After the death of Mrs. Mondelli, her daughter Maria purchased in September 1963 from Vito Mondelli, for a price of $16,000, his interest in the property at Springfield and Summit Avenues, Berkeley Heights. That interest had been devised to Vito by his father's will. It may be noted parenthetically that the facts concerning this transaction were not presented during the course of trial, but a subsequent inquiry addressed to all counsel brought a response by letter dated August 1, 1967 from Vito's attorneys giving me those facts.

Shortly before January 29, 1964, more than four years after Mondelli's death and nearly two years after the death of his widow, Michael Mondelli had agreed to sell to his

brother Vito the four lots ostensibly devised to Michael by the third clause of the will. Both men assumed Michael owned the lots and could make the sale, but when the time for delivery of a deed drew near Michael was advised that his brother Joseph and his sister Maria would have to join as grantors; that they had inherited shares in the lots from their mother. The signatures of Joseph and his wife and Marie and her husband were obtained and a deed to Vito, dated January 29, 1964, was turned over by Michael to Edward A. Pizzi, the attorney who had charge of the transaction. In return he accepted a check for $500, which was the price he and Vito had fixed. During the visit to Pizzi's office when Michael got his check he asked for and got information about the land purportedly devised to Joseph and Maria by the second clause of the will, *i. e.,* the land they had leased to defendant Imbimbo. Michael was then told that his mother's name was on the deed to that land and that all four of the children appeared to have an interest in it. Nevertheless, he went to the bank early the next morning and cashed the $500 check. He testified that the money was then deposited in his own bank account, where it still is. Michael's negotiation of the selling price of the land covered by the third clause of his father's will, followed by taking and keeping the whole of that price, is, of course, consistent with the will and inconsistent with an assertion that he is entitled to an inheritance from his mother contrary to the will as written.

This litigation developed rather quickly after Michael cashed Vito's check. On January 30, 1964 he conferred with his attorneys. By a coincidence, Imbimbo had discussed with his attorney in December 1963 the possibility of a mortgage loan on his leasehold. That led to a brief examination of the county records in order to appraise the task of making a search and it was discovered that Mr. and Mrs. Frank Mondelli had been tenants by the entirety. Unsuccessful efforts then followed to negotiate a title-clearing agreement, and this action was started in June 1964 by

the filing of a complaint in the Law Division. By order of transfer the sixth through the ninth counts of the amended complaint and pleadings responsive thereto are before me.

The sixth count alleges an election by Francesca Mondelli to take under her husband's will. The seventh count alleges any rights as a surviving co-tenant by the entirety were renounced, and it also alleges estoppel. The eighth count is against Vito and Michael Mondelli, and charges that they have elected to take the benefits of their father's will and have renounced any interest in the parcel purportedly devised to Joseph and Maria. The ninth count alleges that estoppel bars them from asserting a claim upon that parcel, the alleged estoppel being based upon Michael's sale to Vito in January 1964 which has already been described.

The judgment sought is one declaring that the land described in the joint devise to Joseph and Maria and ostensibly covered by the Imbimbo lease was not subject, at the time of Francesca Mondelli's death, to any claim of ownership she might have asserted against it, and is not now subject to any claims of ownership by Vito or Michael. Both Michael and Vito Mondelli claim a one-fourth interest in the land in question and, the former cross-claims for partition and an accounting.

The basic principle on which plaintiff Joseph Mondelli relies was stated as follows by Lord Eldon in *Ker v. Wauchope*, 1 *Bli.* 1, 21 *et seq.*, 4 *Eng. Rep.* 8 (*H. L.* 1819):

"If a testator gives his estate to A., and gives A.'s estate to B.; Courts of Equity hold it to be against conscience, that A. should take the estate bequeathed to him, and at the same time refuse to effectuate the implied condition contained in the will of the testator. The Court will not permit him to take that which cannot be his, but by virtue of the disposition of the will; and at the same time to keep what by the same will is given, or intended to be given, to another person. It is contrary to the established principles of equity that he should enjoy the benefit while he rejects the condition of the gift."

The doctrine thus stated has been applied in New Jersey. Our leading case is *Job Haines Home for Aged People v.*

*Keene,* 87 *N. J. Eq.* 509 (*Ch.* 1917), discussed in more detail below.

I am satisfied that Francesca Mondelli never made an election between her rights at law and the provisions of the will. The reason for this conclusion is very simple: not knowing she was a tenant by the entirety, she did not realize a choice was available. Her lack of business experience and formal education rules out any inference that she probably discovered the truth about the titles while a widow. The importance of knowledge and understanding in the making of an election was described in one of our early cases, *English v. Executors of English,* 3 *N. J. Eq.* 504 (*Ch.* 1836), where the Chancellor said:

"What acts of acceptance or acquiescence are sufficient to constitute an election, cannot be designated with sufficient precision to justify a general rule. Each case, as it occurs, must be governed by its own peculiar circumstances. The general questions are, whether the parties acting or acquiescing were cognizant of their rights; whether they intended to make an election; whether they can restore the individuals affected by their claim to the same situation as if the acts had never been performed; or whether these inquiries are precluded by lapse of time: *Dillon v. Parker,* 1 *Swans.* 382, in notis." (at *p.* 509)

This excerpt from the Chancellor's opinion was quoted with approval in *Job Haines Home for Aged People v. Keene, supra,* 87 *N. J. Eq., p.* 517 and was restated more recently in *Ludlum v. Roth,* 126 *N. J. Eq.* 556, 558 (*Ch.* 1940).

Either before or after Mrs. Mondelli's death each of the children took advantage of provisions of Frank Mondelli's will. The several transactions have already been mentioned. Michael and Vito, who now question the effectiveness of their father's will as to the plot purportedly devised jointly to Joseph and Maria, have not offered to undo the transactions from which they have benefited. Indeed, had any such offer come from Michael I think it would have been too late. He had made an election. With knowledge of the tenancies by the entirety he had closed the transaction he had nego-

tiated as sole owner of the property by virtue of his father's will and had lost no time in cashing the check representing the full purchase price.

The facts in *Job Haines Home* have a resemblance to those before me, although covering a longer span of time. One Keene died in 1880 leaving a will by which he purported to devise property to his wife Phoebe for life with remainder to his son Joseph, even though the property would have become Phoebe's absolutely as a surviving tenant by the entirety. He also made provision for his other children by the will. Thereafter Joseph and his mother used the property in question as their home. When the mother died Joseph continued to live there until his death in 1912. By the terms of his will he gave the property to Job Haines Home, which thereafter found it necessary to bring a suit to quiet title. The heirs of Phoebe Keene were made defendants and some of them asserted ownership based on her title as surviving tenant. Vice-Chancellor Foster held Job Haines Home had good title; that there had been binding elections to take under the wills of Alfred Keene and that of his son Joseph, and that both wills were therefore to be given effect. After referring to *Young v. Young,* 51 *N. J. Eq.* 491, 500 (*Ch.* 1893), and giving the same quotation from *English v. Executors of English* which I have used above, the vice-chancellor went on to say:

"These statements of the law are particularly applicable to the situation under consideration. Lapse of time and the death of Mrs. Keene and her three sons render it impossible to restore the parties to their original position. In reliance upon the election of his mother and brothers, Joseph made no effort to collect the indebtedness owing him from his father's estate; and relying on their apparent election he permitted them to divide the greater part of the estate among themselves; during the thirty or more years of his occupancy of the premises, with their consent or acquiescence he treated the property as his own and paid the taxes, made improvements thereon, and generally acted as, and publicly claimed to be, the owner of the property, and it would now be impossible to have an accounting of his expenditures in order to reimburse his estate.

\* \* \* \* \* \* \* \*

The doctrine of election is one resulting in compensation, and not in forfeiture (*Young v. Young, supra*), and if it were possible for defendants to properly reimburse and compensate the estate of Joseph for all that was due him, a different construction might be put upon their conduct and upon the acts and conduct of Mrs. Keene and her sons. But as such compensation cannot be made, principally because the amount required cannot be ascertained with any degree of accuracy, I deem it equitable under all the circumstances that defendants should not be permitted to recede from the former action of themselves and of those under whom they claim; and to hold that Mrs. Keene and her sons exercised their election under the will of Alfred Keene, and that defendants also exercised their election under the will of their Uncle Joseph." (at *pp.* 517–518)

I doubt that it was necessary for the court to conclude there had been an election, thus suggesting an informed and conscious choice by heirs of Phoebe Keene. Changes during the years since her death appear to have been the real basis for the decision. This is a field in which altered positions and passage of time are important. *Young v. Young, supra; English v. Executors of English, supra.* And in 5 *Page on Wills* (*Bowe-Parker rev.* 1962) § 47.21, *p.* 637, the author says:

"Where the rights of third parties are involved, acts of the person entitled to elect may estop him from making an election inconsistent therewith, even though such acts might not otherwise constitute an election."

Before any claim contrary to the terms of Frank Mondelli's will was asserted, changes resulting from the conduct of the parties and the passage of time had occurred to make it excessively difficult, if not impossible, to restore a real substitute for the situation which prevailed when the testator died or for the situation prevailing at his widow's death. Michael, aside from his election in favor of the will, cannot offer anyone a one-fourth interest in the lots devised to him; they have been sold. Vito has not suggested giving up the estate devised to him, as he would have to do under the principle stated in *Ker v. Wauchope, supra;* and in fact he cannot give it up, for he, too, has sold out. To hold that

Michael and Vito have undivided one-fourth interests in the plot that their father thought he was giving to Joseph and Maria would be to reach a result inequitable in such a way and to such an extent that the inequity cannot be offset now by a general redistribution. There will be judgment for the plaintiffs.

A separate comment about defendant Imbimbo's position is fitting. The proofs do not show whether Michael and Vito and Francesca had knowledge of the pending lease before it was executed but I think that unimportant. All three of them believed that Joseph and Maria were owners of the plot in question and would have expected Joseph and Maria to sell or lease or do anything else that an owner might do. Of course, Imbimbo could have avoided difficulties by procuring a title search before leasing, yet the Mondellis could have learned easily the true state of their own titles. The lessee relied upon a belief that Joseph and Maria were the owners of the property in which he was interested—an impression to which all the Mondellis in a real sense contributed. I think it would be inequitable now to terminate the lease because two members of the family, after the lessee has made a substantial investment, have acquired knowledge which was always available to them, and have asserted claims of ownership. If there was not otherwise a basis in this case for rejecting all claims of Michael and Vito, they would be barred by estoppel from relief against defendant Imbimbo. *Page on Wills, supra.*

No costs.